## Case No. 16,239.

### UNITED STATES v. The SCIENCE.

[20 Leg. Int. 68;[1] 2 Pittsb. Rep. 446; 5 Phila. 257; 10 Pittsb. Leg. J. 203; 11 Pittsb. Leg. J. 3–9.]

District Court, W. D. Pennsylvania.　Jan. 10, 1863.

NAVIGATION OF STEAM VESSELS—SAFETY OF PASSENGERS—LICENSED PILOTS ON OHIO RIVER —VIOLATION OF STATUTE.

1. The act of congress of August 30, 1852 [10 Stat. 61], providing for the better security of the lives of passengers on board of vessels, propelled in whole or in part by steam, requires that every one connected with the navigation of such vessels, whether upon the rivers, the lakes or the ocean, be held to the strictest accountability.

2. A vessel, with passengers, navigating between ports so distant from each other as Pittsburg and Gallipolis on the Ohio river, having but one licensed pilot on board, the captain acting also as pilot, has not the "complement" of licensed pilots required by the act.

3. If the captain of the boat is deprived of his "complement" of pilots, during a voyage, without his consent, fault or collusion, the deficiency may be temporarily supplied, until others, licensed, can be obtained.

4. But he has no right to begin a new voyage and imperil the lives of passengers, by arrogating to himself the knowledge and responsibility of licensed pilots, whose function alone in the navigation of the vessel the law recognizes.

5. If he does so he incurs himself the penalty of $100, imposed by the act of August 30, 1852, besides subjecting his boat and its owners, under a proceeding in admiralty, to the penalty of $500, under the 1st section of the act of July 7, 1838 [5 Stat. 304].

[Cited in Pollock v. The Sea Bird, 3 Fed. 576.]

In admiralty.

M'CANDLESS, District Judge.　This is a libel in rem upon information of the United States district attorney, against the steamboat Science, for a violation of the act of congress of August 30, 1852, which provides for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam. It is charged that the said steamboat did carry passengers on the Ohio river, from Gallipolis to Pittsburg, and from Pittsburg to Gallipolis and intervening places, and did leave the ports of Pittsburg and Gallipolis with passengers to perform her said voyages, without a complement of pilots duly licensed by the inspectors, as required by the said act of congress, and did perform said voyage without said complement of licensed pilots; and it is further charged that Wm. Reno, the master of said vessel, who is not a licensed pilot, did perform the duties of one of the pilots, and did assist in navigating said vessel on said voyages. The allegations in the libel being denied by the answer, we must look to the proofs to ascertain whether they have been sustained.　It appears from

[1] [Reprinted from 20 Leg. Int. 68, by permission.]

these, that, in the month of April last, this boat, commanded by Wm. Reno, left the port of Pittsburg for Gallipolis with two pilots, and that at Gallipolis, one of them was discharged for drunkenness; that the other pilot and the captain navigated the boat back to Pittsburg, and, on their way up, stopped at Moro Castle, to procure the services of a pilot named Stewart.　He could not go, but told the captain if he would call on his way down he would enter his service.　On his return, Stewart did go on board, and with Kerr, the other regularly licensed pilot, took the boat to Portsmouth, and back to Pittsburg.　At Pittsburg, Stewart stated that his license was about expiring and that he would have to go to Cincinnati to renew it.　He made the voyage again from Pittsburg to Gallipolis, and back to Long Bottom or Moro Castle, where he left the boat, and, failing to make the connection with her, either at Pittsburg or Moro Castle, he never returned to her service.　The trips made by the boat after the discharge of Franklin Reno, and before the employment of Stewart, and after Stewart left and before Skaggs was employed, were made by Kerr, a regularly licensed pilot, and Wm. Reno, who had no license, operating the wheel which guides the vessel.　Here is a plain infraction of the act of congress, for there was not a "complement" of licensed pilots, to navigate a vessel whose trips were between ports so distant from each other.

Although the act imposes a penalty upon those who employ or are employed as unlicensed pilots, yet the very first section of this act of 1852 provides that if any such vessel shall be navigated, with passengers on board, without complying with the terms of this act, the owners thereof and the vessel itself shall be subject to the penalties contained in the second section of the act to which this is an amendment.　It only remains to inquire what are the provisions of this section of the act of July 7, 1838, to which we are referred for the penalty.　It declares that "for each and every violation of this section, the owner or owners of said vessel shall forfeit and pay to the United States the sum of five hundred dollars, one-half for the use of the informer, and for which sum or sums the steamboat or vessel so engaged shall be liable, and may be seized and proceeded against, summarily, by way of libel, in any district court of the United States having jurisdiction of the offence."　If the captain of the boat is deprived of his "complement" of pilots, during a voyage, without his consent, fault or collusion, the deficiency may be temporarily supplied until others, licensed, can be obtained.　But he has no right to begin a new voyage and imperil the lives of passengers for whose security this act was passed, by arrogating to himself the knowledge and responsibility of licensed pilots, whose function alone, in the navigation of the vessel, the law recognizes.　If he does so, he incurs a penalty himself, besides subjecting his boat and its own-

ers to this proceeding in admiralty. The lives of passengers are of more importance than the loss to the purses of the owners by the lapse of a single trip. The latter may be repaired, the former cannot, and every one connected with the navigation of boats propelled in whole or in part by steam, whether upon the rivers, the lakes or the ocean, should be held to the strictest accountability. And as one of the surest ways to reach them, congress wisely provided that the vessel and its owners should be responsible for any breach of the law. This act of congress is a great public protection. Its value can only be estimated by the number of lives it has saved. In passing it, congress designed to require from all the officers connected with the management of the vessel, the utmost vigilance. The pilot, guiding the boat by his bell, commands the engineer. If the pilot is uninstructed, has not passed an examination, or in the words of the act of congress, is not "licensed," the vessel, cargo and passengers, at midnight or midway, may all go to the bottom. Of what consequence are excuses, under such circumstances, to the owners of the boat, to the consignors or consignees, or to the families whose friends have been lost? Unfriendly as this law seemed at the beginning to those peculiarly affected by its provisions, time, and its proper administration by the supervising and local inspectors, have magnified its value and developed its wisdom. The courts should see that it is rigorously executed; and while I sit here, no trivial or pecuniary considerations shall be admitted as reasons for a refusal to comply with its just and wise conclusions.

The steamboat Science is condemned, to be released upon the payment of $500, and the costs of this libel. Decree accordingly.